## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,  CASE NO. 19-CR-20141-JLK-2

        **Plaintiff,**

**vs.**

**VICTOR ROJAS,**

        **Defendant,**

_____/

### DEFENDANT, VICTOR ROJAS'
### MOTION FOR A DOWNWARD VARIANCE
### PURSUANT TO THE TITLE 18 U.S.C. §3553(a) FACTORS

**COMES NOW** the Defendant, **VICTOR ROJAS**, by and through his undersigned counsel, and presents herewith, his Motion for a Downward Variance pursuant to the Title 18 U.S.C. §3553(a) Factors, and states as follows:

### INTRODUCTION

At the start it should be clear that Victor Rojas is sincerely remorseful for his criminal conduct and acknowledges that the offense to which he has entered his plea of guilty is of a serious nature.  Further, the Defendant wholly realizes the impact his poor decision to become involved in this criminal conduct will have upon his family and his future, and knows that he has nobody to blame but himself.

The United States Supreme Court has stated that Federal sentencing demands that every convicted person be treated as an individual and "every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Gall v. United States*, 128 S.Ct. 586, 589 (2007).  It is the sincere hope that this Honorable Court will examine Mr. Rojas' "human failings" along with the other aspects of his life, and find that a sentence well-below the advisory sentencing guideline range is appropriate. Further, the Defendant would

respectfully request the Court to take note that he has been in custody since April 25, 2019, unable to meet the requirements of the stipulated $250,000 corporate surety bond and as a result of a detainer issued from the Southern District of New York.  It should further be noted that, being a Bolivian citizen, at the completion of the Defendant's term of imprisonment, he will be surrendered to the custody of the U.S. Immigration and Customs Enforcement for deportation or removal proceedings consistent with the Immigration and Nationality Act.

On October 31, 2019, this Honorable Court sentenced the Defendant's brother, Juan Rojas, to a **forty-six (46) month** term of imprisonment and three (3) years' supervised release for his participation in this money laundering conspiracy, and it is submitted that to avoid a disparity in sentencing the same sentence would be appropriate for this Defendant, Victor Rojas. [See D.E. 51 – Juan Rojas' Judgment entered on November 1, 2019]. (This point is discussed in-detail in a separate section below.)

According to the Government, Ruben Dario Rojas Bascope, the Defendant's older brother, was the leader/organizer of the conspiracy. On May 8, 2019, he was transferred to fugitive status, never having been apprehended.

## PROCEDURAL BACKGROUND

1.      On January 27, 2020, the defendant pled guilty to Count One of a four-count Indictment. Count One charged him with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). He was not named in Counts Two through Four of the Indictment. [D.E. 61]

2.      The Presentence Investigation Report provides at paragraph 79: "Guideline Provisions: Based upon a total offense level of 27 and a criminal history category of I, the guideline imprisonment range is 70 to 87 months." [D.E. 66]

3.     The Defendant has filed Objections to the Presentence Investigation Report, therein arguing that he should receive a four (4) level *minimal role* reduction, or in the least, a three (3) level *intermediate mitigating role reduction* for his truly minimal role in the criminal activity, therefore  resulting in a total offense level of 25 and a criminal history category of I, the *advisory guideline imprisonment range* should be **57 to 71 months**, or alternatively, resulting in a total offense level of 26 and a criminal history category of I, the *advisory guideline imprisonment range* should be **63 to 78**, before the application of any applicable downward departures and/or variances that this Honorable Court may deem appropriate.   Other than the extent of mitigating role reduction, there are no other objections for this Court's determination. [D.E. 67]

4.     The sentencing hearing is presently scheduled for Monday, August 17, 2020 at 10:00 a.m. [D.E. 71]

5.     The within Motion for a Downward Variance pursuant to the Title 18 U.S.C. §3553(a) Factors is submitted in the utmost of good faith and in the interest of justice.

## THE HISTORY AND CHARACTERISTICS OF VICTOR ROJAS THAT WARRANT CONSIDERATION

Title 18 U.S.C. §3553(a)(1) provides that the court in fashioning the appropriate sentence to be imposed, shall consider "*the nature and circumstances of the offense and the history and characteristics of the defendant*."

With regard to the history and characteristics of Victor Rojas, the Presentence Investigation Report prepared by the very capable Probation Officer more than adequately sets out the family history and personal information of the Defendant. However, there are a few points that should be highlighted.  (*Correspondence directed to the Court relating to Victor Rojas' good character are attached hereto as* **Composite Exhibit "A."**)

First, not to lessen the Defendant's sincere acceptance of responsibility, it should be noted that the Defendant is the youngest of seven siblings, who was raised in large part by the most culpable defendant in this case, his older brother, Ruben Dario Rojas Bascope. Although at all times material hereto Victor Rojas was certainly a fully grown adult, how the influence of an older brother who raised you can never truly be known.

As so many before him, Victor Rojas came to this country with dreams of making a better life for himself. The first thing he did to achieve that goal was to enroll in English classes. He attended college at King's Borough Community College, and studied English for two years while working in construction during the daytime hours. As a result of the Defendant's hard-work and studies, he is now fully bilingual.

At that time, he was with Norma Chavez Arenas and they had their first daughter, Tatiana (now 25 years of age). That child was the most wonderful thing that happened in his life up to that point.

During that time period, Mr. Rojas became the manager of the parking company that he was working with. He saved money to buy a home and to provide a better education for his daughter.

In 2003 his second daughter was born, "R.R." (now 17 years of age), and they bought a house in New Jersey, living a quiet life and always being attentive to the needs of the daughters, and teaching them to be caring and respectful of other people, and to contribute to society in whatever way they could. Victor Rojas is very proud of his daughters and knows that he has been blessed.

Norma Chavez, the mother of Victor Rojas' daughters, has opined when referring to him: "I have experienced an individual whom I have known as a person with values, principles and

impeccable conduct, noble, honest and very much loved by those around him. It is worth emphasizing that he worked hard from sunrise to sunset so that his family did not lack anything."

Tatiana Rojas, who is Victor Rojas' oldest daughter, has stated that "she is now a 24-year-old woman, currently a Nutrition student attending Montclair State University. For all my 24 years I can state and confirm my dad has always been there for his family no matter what."

"R.R.," Victor Rojas' younger daughter, has stated, "My father was a man who knew right from wrong when he was involved in my life. He cared and loved his family for most of his life, and even if we weren't there we would always be on his mind. He'd bring us gift whenever he could. He is a loyal and good hearted man. He was a man who wouldn't kill a spider, but trapped it and took it outside."

The Defendant's sister, Tatiana Rojas, has stated, "Victor Hugo immigrated to the United States with dreams of self-improvements, he learned English and had his exemplary daughters and a family that he'd taken care of all this time … He always helped our Mother and siblings as needed. He was always attentive and friendly. His best traits were exemplary when attending his customers, bosses and neighbors; everyone had great things to say about him. … I feel that he was naive in the ways that lead him to where he is now. Before this case, he had never been arrested, much less jailed. I think he has learned that the worst of all aspects of the loss of freedom is the separation of his family and loved ones. I believe if he had realized the impact he was going to have on the people he most loved, he would never have done what he did. He always valued his morals and values that his peers had taught him. He appreciated the opportunities that this country offers to its immigrants. I think he could have done much more with his life and I also think he sees it now, but it is not too late … In a few years he could see his daughter's finishing college and have the opportunity to be united with family and friends again. I would like him to be beside my

mother during her last days, and time is sadly running out. I tell you all these things because I want you to know that it is very painful for our family to see his daughters suffering the way they are. They need their fathers support to move forward in life."

### *Victor Rojas should receive the same forty-six (46) month sentence as his brother/co-defendant, Juan Rojas, so as to avoid a disparity in sentencing.*

Title 18 U.S.C. §3553(a) provides that one of the goals of sentencing is to avoid disparities in sentencing.

Specifically, §3553(a)(6)provides:

> **"(a) Factors to be considered in imposing a sentence.**--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
> **…………………………………….**
> **(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and …"

The sentences imposed on defendants "with similar records who have been found guilty of similar conduct" is an important factor to consider and the Court should vary downward to "avoid unwarranted sentence disparities." 18 U.S.C. § 3553(a)(6).

In the context of this case, on October 31, 2019 this Honorable Court sentenced the Defendant's brother, Juan Rojas, to a **forty-six (46) month** term of imprisonment and three (3) years' supervised release for his participation in this money laundering conspiracy, and it is submitted that to avoid a disparity in sentencing the same sentence would be appropriate for this Defendant, Victor Rojas.

First, it would be appropriate to compare the participation of each in the money laundering conspiracy as recounted by the Presentence Investigation Report, which demonstrates Juan Rojas'

hands-on role with regard to the actual currency, unlike that of Victor Rojas, who only participated

in some wire-transfer banking activities.

● With regard to the participation of Juan Rojas, the Presentence Investigation Report

reflects the following:

12. The CS introduced undercover law enforcement officers (UCs) to conduct these money pickups. Between March 2015 and May 2016, the UCs picked up bulk currency on nine occasions. Three pick-ups were in South Florida, and six pick-ups were in Amsterdam, Netherlands. For the three money pick-ups in South Florida (May 12, 2015; May 29, 2015; and January 25, 2016), **Juan Rojas personally delivered the money** to the same UC …

13. Each of the three times **Juan Rojas delivered the money** in South Florida, he turned it over to the UC in a parking lot. On the first two pick-ups, the money was delivered in a black backpack with a "Real Madrid" logo. Subsequently, a narcotics dog gave a positive alert on each of the three bulk cash pick-ups in South Florida.

14. Another confidential source (CS2) **positively identified Juan Rojas** from his driver's license photo as **a person that he had delivered bulk-cash from illegal or unlawful proceeds** to, on at least two occasions in 2015. CS2 picked up the cash in South Florida from an unknown individual at the direction of a Bolivian drug trafficker and each time the money was contained in a black backpack with "a soccer logo" (consistent with Real Madrid). **After receiving the cash, CS2 then delivered it to Juan Rojas in the same black backpack.** CS2 was directed to tell Juan Rojas that this money was on behalf of Ruben Rojas. Phone records indicated that **the CS's phone was in contact with Juan Rojas' phone approximately 14 times on May 29, 2015, the day that Juan Rojas delivered $200,080 in a black backpack with a "Real Madrid" logo to an undercover agent.**

15. In addition to serving as a money courier for illegal or unlawful proceeds, bank records indicated that **Juan Rojas also received some of the proceeds of the nine pick-ups from a UC bank account into his personal bank accounts in Florida and wired them to other domestic and foreign accounts** at Ruben Rojas' direction. These were for money pick-ups on: March 31, 2015; July 17, 2015; July 21, 2015; and August 26, 2015. The **proceeds which were laundered through his personal bank account** in Florida totaled approximately $454,150. For example, in relation to the money pick-up on March 31, 2015, after the UC received 500,000 Euros in Amsterdam, Netherlands, the CS was directed by Ruben Rojas to wire $100,000 to Juan Rojas. Accordingly, **the UC controlled bank account wired Juan Rojas' Citibank personal bank account** ending in 1563 $50,000 on April 8, 2015, and another $50,000 on April 9, 2015. **Juan Rojas wired most of this $100,000 out to other bank accounts in less than 30 days.**

● With regard to the participation of the Defendant, Victor Rojas, the Presentence Investigation Report reflects the following:

16. Victor Rojas' bank records indicated that he also received some of the proceeds of each of the nine money pick-ups from a UC bank account into his personal bank accounts in New York and wired them to other domestic and foreign accounts at Ruben Rojas' direction. The proceeds which were laundered through his personal bank accounts in New York totaled approximately $1,733,016. For example, in relation to the money pick-up on March 31, 2015, after the UC received 500,000 Euros in Amsterdam, Netherlands, the CS was directed by Ruben Rojas to wire certain amounts to a New York bank account controlled by Victor Rojas. Accordingly, the UC controlled bank account wired Victor Rojas' Chase Bank personal bank account ending in 9865 $48,534 on April 9, 2015, and another $55,280 on April 10, 2015, for a total of §103,814. On April 13, 2015, Victor Rojas wired a total of $100,000 to a corporate bank account at a South American bank. This transfer was subsequently declined by the bank and the funds were returned to Victor Rojas, who successfully wired $95,000 to another South American bank on April 20, 2015. Similarly, in relation to the money pick-up on January 25, 2016, the UC received $501,006 in Pembroke Pines, Florida, and was directed by Ruben Rojas to wire certain amounts to two New York bank accounts controlled by Victor Rojas. On January 29, 2016, the UC transferred $100,000 to Victor Rojas' Chase Bank account ending in 9865 and another $100,000 to Victor Rojas' Bank of America account ending in 0937.

As can be seen from the above language in the Presentence Investigation Report, the participation of Juan Rojas was far beyond that of the Defendant, Victor Rojas, and that is why a minimal role reduction is warranted for Victor Rojas to avoid a disparity in sentencing.

Next, we shall turn to the Factual Proffer in this case [D.E. 63], which likewise demonstrates the participation of Juan Rojas was far beyond that of the Defendant, Victor Rojas.

With regard to Juan Rojas:

Between March 2015 and May 20l6, the UCs picked up bulk currency on nine (9) occasions. Three pick-ups were in South Florida, and six pick-ups were in Amsterdam, Netherlands. For the three money pick-ups in South Florida (money pick up #2, #3, and #8), Juan Rojas personally delivered the money to the same UC … Each time Juan Rojas delivered the money in South Florida ($179,985 USD on 5/12/15, $200,080 on 5/29/15, and $501,006 on 1/25/16), he turned it over to the UC in a parking lot … CS2 picked up drug proceeds in South Florida from an unknown individual at the direction of a Bolivian drug trafficker … After receiving the drug proceeds, CS2 then delivered the proceeds

8

to Juan Rojas … Phone records indicate that the CS's phone was in contact with Juan Rojas' phone (ending 8412) approximately 14 times on May 29, 2015 …"

With regard to Victor Rojas:

> Bank records indicate that Victor Rojas received some of the proceeds of al1 of the 9 money pick-ups from a UC bank account into his personal bank accounts in New York and wired them to other domestic and foreign accounts. Ruben Rojas advised the CS about each money pick-up and he advised the CS to direct that a certain portion of each pick-up be wired to Victor Rojas' New York bank accounts. Victor Rojas accepted, controlled and then wired approximately $1,733,016 in drug trafficking proceeds through his personal New York bank accounts. (The Factual Proffer then goes on to detail the Defendant's receipt of wire transfers as well as some wire transfers out of his bank accounts, all at the direction of Ruben Dario Rojas Bascope.)

Therefore, based on the foregoing, the same sentence should be imposed for Victor Rojas as was imposed for Juan Rojas, to wit: a forty-six (46) month term of imprisonment and three (3) years' supervised release, so as to avoid a disparity in sentencing.

### *Title 18 U.S.C. § 3553(a)(2)(A)*
### *"the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."*

As part of its sentencing obligations, this Court should consider the need for the sentence imposed to "provide just punishment for the offense." *Title 18 U.S.C. § 3553(a)(2)(A)*.

To determine the just punishment for Victor Rojas, the Court should consider how he will serve his prison time. In this instance he will spend a portion of his time in lockdown conditions similar to solitary confinement. Since March 13, 2020, the BOP "modified its operations" to respond to the spread of COVID-19.[1] Individuals "in every institution" are "secured in their assigned cells/quarters to decrease the spread of the virus." Family and friends are prohibited from visiting. Programming, absent select UNICOR operations, has ceased and movement throughout

---

[1] Fed. Bureau of Prisons, *Fed. Bureau of Prisons COVID-19 Action Plan* (Mar. 13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp (Phase II). Phase II's modified operations were extended as described in Phase III, Phase IV, Phase V, Phase VI, and Phase VII.

the facility is suspended.  And while BOP's website claims movement exceptions are made to permit showers three times a week, telephone and email access, commissary, and laundry, in reality even these most basic activities are not always allowed, and instead, conditions amount to a "total lockdown" for "almost twenty-four hours a day."

Not only will Mr. Rojas be on lockdown, prohibited from seeing his loved ones, and unable to engage in rehabilitative or productive programming, he will also be at grave risk of contracting COVID-19.  CDC guidance, such as social distancing, is simply "impossible to achieve in our federal prisons"—particularly during a lockdown.[2]  Incarcerated individuals share bathrooms, sinks, showers, and telephones. They eat together, and sleep in close proximity to each other. They lack the freedom to bathe regularly and are unable to effectively disinfect their surroundings. Unsurprisingly, these conditions have fueled the spread of COVID-19 throughout BOP facilities.

Specifically, according to the Federal Bureau of Prisons online resource page, as of July 26, 2020, "[t]here are 4,311 federal inmates and 401 BOP staff who have confirmed positive test results for COVID-19 nationwide. Currently, 5,928 inmates and 677 staff have recovered. There have been 100 federal inmate deaths and 1 BOP staff member death attributed to COVID-19 disease."

It is submitted, that because of COVID-19, any time Mr. Rojas spends in prison will necessarily be more severe than it ordinarily would be. Therefore, the Defendant requests this

---

[2] Letter from Dr. Sandro Galea, Dean, Boston Univ. School of Pub. Health, et al., to President Trump 1 (Mar. 27, 2020), https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-Trump.pdf (co-signed by numerous public health officials from leading medical and public health institutions); *see also* Ctrs. for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://bit.ly/2M9IF6a (last visited May 28, 2020) (recognizing that correctional and detention facilities present "unique challenges for control of COVID-19 transmission," due to the fact that individuals "live, work, eat, study, and recreate within congregate environments").

Honorable Court to consider the oppressive nature of BOP confinement in varying below the guidelines range.

### Title 18 U.S.C. § 3553(a)(2)(D)
**"the need for the sentence imposed . . . to provide defendant with needed educational and vocational training."**

One of the fundamental purposes of sentencing is rehabilitation.[3]  However, rehabilitation is currently impossible in the BOP.  In an attempt to respond to COVID-19, the BOP has implemented a modified operation plan, which limits social visits, inmate movement, and has suspended all volunteer visits, including visits from religious advisors. Under these modified operations, Mr. Rojas will be unable to receive programming and rehabilitative resources, and instead, will be confined in his "assigned cells/quarters."  Inasmuch as Mr. Rojas will receive no rehabilitation in prison for a period of time, it is respectfully requested that this Court consider this fact in determining a variance in this case.

### Title 28 U.S.C. § 994(g)
**"the Commission shall take into account the nature and capacity of the penal, correctional, and other facilities and services available" and "the sentencing guidelines . . . shall be formulated to minimize the likelihood that the Federal prison population will exceed the capacity of Federal prisons."**

When enacting the Sentencing Reform Act of 1984, Congress confirmed that the "nature and capacity" of federal prisons is a critical sentencing consideration.[4]  For this reason, Congress obligated the Sentencing Commission to formulate guidelines "to minimize the likelihood that the Federal prison population will exceed the capacity of the Federal prisons." *Title 28 U.S.C. § 994(g).*

---

[3] Title 18 U.S.C. § 3553(a)(2)(D).
[4] Title 28 U.S.C. § 994(g).

Despite this obligation, BOP facilities have historically been, and remain, overcrowded.[5] Adding COVID-19 to the mix has resulted in prisons and jails that are even more dangerous, inhumane, and deadly than before.  The BOP is simply not equipped to handle this global pandemic. Courts have called BOP's COVID-19 response "an outrage" and "Kafkaesque," confirming that "BOP is struggling to handle this crisis within its prison population."[6]

### *The Defendant's Employment History*
### *As Reflecting on the 18 U.S.C. §3553(a) Factors.*

With regard to the Defendant's employment history, aside from his unfortunate and foolish participation in this criminal conduct, he has always held legitimate employment, never being afraid of hard-work as shown below.

Victor Rojas was employed as a parking lot attendant for Manhattan Parking in Manhattan, N.Y. from 2006 to 2009, earning $10 per hour.

---

[5] *See* Fed. Bureau of Prisons, *Fed. Bureau of Prisons Program Fact Sheet* (rev. July 31, 2019) https://bit.ly/36B3YXZ; *see also* U.S. Dep't of Justice, *FY2020 Performance Budget Congressional Submission Federal Prison Systems Buildings and Facilities* 3-4, https://bit.ly/2M9nRvv; *see also*; Oversight of the Federal Bureau of Prisons and Implementation of the First Step Act of 2018: Hearing before the Subcomm. On Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary, 115th Cong. 2-4 (2019) (statement of Kathleen Hawk Sawyer), https://bit.ly/2M0E2LR.

[6] *United States v. McIndoo*, ---F.Supp.3d---, 2020 WL 2201970, at *8 (W.D.N.Y. May 6, 2020); *see also* Class Action Complaint, *Torres v. Milusnic*, No. 20-cv-04450 (C.D. Cal. May 16, 2020), ECF No. 1, at 79 (Declaration of Shamsher Samra, M.D.) (recognizing that the alleged conditions at Lompoc "make it virtually impossible to ensure the safety of prisoners who remain housed at the facility if the current course is maintained" and the conditions "practically ensure[ ] that all remaining prisoners will eventually contract COVID-19 unless extraordinary measures are taken now"); Emergency Petition for Writ of Habeas Corpus, *Wilson v. Williams*, No. 20-cv-794 (N.D. Ohio Apr. 13, 2020), ECF No. 1-3, at 4 (Declaration of Meghan Novisky, PhD) ("To be clear, without drastic intervention, may more incarcerated individuals and staff [at FCI Elkton] will become infected and will face elevated risks for medical complications and mor[tality]."); Mem. in Support of Mot. for Immediate Bail, *Grinis v. Spaulding*, No. 20-cv-10738-GAO (D. Mass Apr. 15, 2020), ECF No. 4-7, at 8 (Declaration of Dr. Joe Goldenson) ("persons currently detained at FMC Devens are at significantly greater risk of contracting COVID-19 than if they were permitted to shelter in place in their home communities").

12

From 2009 to September 2018, the Defendant worked as a parking lot and account manager for Rapid Park, in Manhattan, New York, earning $18 per hour. (There is a slight discrepancy between the Defendant's records and the former employer's records noted in the Presentence Investigation Report.) The employer was contacted by the Probation Office and they advised that they would consider re-employing the Defendant.

Additionally, from 2015 to 2017, Victor Rojas worked as an Uber driver, in New York, and was making $250 per week.

### *Departure Based Upon U.S.S.G. §5H1.9*
### *Dependence upon Criminal Activity for a Livelihood*

The United States Sentencing Commission has stated in a policy statement §5H1.9, that the degree to which a defendant depends upon criminal activity for a livelihood is relevant in determining the appropriate sentence.

It is submitted that the Defendant's employment history demonstrates that he has not been dependent upon criminal activity for his livelihood. Further, it should be noted that the Defendant was gainfully employed during the time that he participated in the money laundering conspiracy.

### *18 U.S.C. § 3553(a)(2)*
### *The need to protect the public from further crimes of the defendant.*
### *There is a Low Risk of Recidivism.*

Another important fact regarding this Defendant is that there is a low risk of recidivism and a correspondingly lesser need of incarceration to protect the public. 18 U.S.C. §3553(a)(2).

Certainly, the likelihood of this Defendant engaging in criminal conduct in the future is extremely small. Mr. Rojas desires to live the rest of his life in a wholly law-abiding manner.

Therefore, it is submitted that a sentence well-below the low–end of the advisory sentencing guideline range will protect the public from further crimes, since there is a low risk of recidivism and a correspondingly lesser need of incarceration to protect the public. 18 U.S.C.

§3553(a)(2).  Further, it should be noted that the Defendant will be removed or deported pursuant to the Immigration and Nationality Act upon his surrender to United States Immigration and Customs Enforcement.

***The Defendant's Assistance to the Government as a
Title 18 U.S.C. §3553(a) Factor***

The Defendant was fully debriefed and described everything he knew about his criminal conduct as well as the conduct of others.  In-fact, the agents had advised the Defendant that they were focused on his brother, Ruben Dario Rojas Bascope, so in an effort to assist the agents, he arranged for a meeting with his brother in Brazil and flew to Brazil with the agents[7], however, through no fault of the Defendant, his brother did not show up as planned.

Victor Rojas supplied whatever information he could in a candid and truthful manner, never attempting to diminish his role in the criminal conduct.  Further, at all times the Defendant stood ready, willing, and able to testify in the event needed by law enforcement and the prosecutors.

Although the Government will not be filing a motion for reduction of sentence pursuant to U.S.S.G. §5K1.1, this Court may consider the Defendant's cooperation as bearing upon the *characteristics of the defendant.*

Specifically, this Honorable Court may take the Defendant's cooperation into consideration when applying the Title 18 U.S.C. §3553(a)(1) factors with regard to the history and characteristics of the Defendant in accord with *United States v. Robinson*, 741 F.3d 588 (5th Cir. 2014).

---

[7] Brazil was chosen by the agents, since they were not permitted to partake in their investigative activities in Bolivia as a result of the lack of cooperation between the United States and the Country of Bolivia.

The court in *United States v. Robinson,* 741 F.3d 588 (5th Cir. 2014) held that a sentencing court has the power to consider a defendant's cooperation under §3553(a), *irrespective* of whether the Government files a §5K1.1 motion and that a sentencing court's failure to recognize its discretion to consider a defendant's cooperation under §3553(a)(1) is a significant procedural error.

### *More onerous Conditions of Incarceration for Foreign Nationals such as the Defendant*

Mr. Rojas will be treated differently by the Federal Bureau of Prisons and will be subjected to a longer and more onerous term of incarceration than a similarly-situated United States citizen. First and foremost, defendants who do not have legal immigration status in the United States serve longer terms of imprisonment than similarly situated non-alien defendants with the same sentence. A United States citizen is eligible for programs such as release to a halfway house.[8] A citizen is eligible to be housed at a minimum-security facility, such as a less restrictive "camp" facility. Mr. Rojas is not.[9] *United States v. Zapata-Trevino*, 378 F. Supp. 2d 1321, 1328 (D.N.M. 2005).

---

[8] Unwarranted disparity occurs as result of BOP policy that "after service of his sentence, the [deportable detainees] will be released to the custody of the Department of Homeland Security ("DHS") for removal from the United States. Release into DHS custody can, and generally does, mean a further term of detention until his removal has been completed." *United States v. Ramirez-Ramirez*, 365 F. Supp. 2d 728, 733 (E.D. Va. 2005). Deportable detainees are ineligible for release to a halfway house at the end of their sentences, which serves to also increase their term of imprisonment. *See Chapter 4: Description of Drug Treatment Programs and Services*, 70, *available at* http://www.bop.gov/policy.

[9] Inmates who do not have legal immigration status "shall be housed in at least a Low security level institution." Bureau of Prisons, Program Statement, Inmate Security Designation and Custody Classification, P5100.08 Ch. 5, Sept. 12, 2006, at 9. The Federal Bureau of Prison's Program Statement P5100.08, Chapter 5, pages 7-9 indicates that deportable alien status is considered a "public safety factor." Chapter 2, page 4, provides, "[t]here are nine Public Safety Factors (PSFs) which are applied to inmates who are not appropriate for placement at an institution which would permit inmate access to the community (i.e., MINIMUM security)." *Id.* Consequently, Victor Rojas is not eligible for housing in less restrictive "camp" facilities.

15

Consequently, Mr. Rojas faces a longer period of incarceration due to his ineligibility for possible release to a halfway house, and placement in a higher security, more restrictive setting than a similarly-situated United States citizen.

Courts have recognized that below-guidelines sentences are appropriate given this harsher treatment of defendants without legal immigration status. *See Zapata-Trevino*, 378 F. Supp. 2d at 1328 ("Because of his immigration status, a defendant may not be eligible for certain Bureau of Prisons programming, and must be placed, at the minimum, in a low-security facility rather than at a more relaxed 'camp.' Additionally, Defendant will not be eligible for early release.").

Upon completion of his sentence, Victor Rojas will be removed or deported. Thus, a lengthy sentence is not necessary to protect the public. Furthermore, defendants with immigration detainers are typically designated and housed at privately-run facilities with limited educational and vocational training opportunities. "When a defendant will ultimately be removed and sent out of the country, there is less need for the sentence imposed to protect the public from further crimes of the defendant, or to provide the defendant with needed educational or vocational training." *United States v. Ramirez-Ramirez*, 365 F. Supp. 2d 728. Also see: *United States v. Smith*, 27 F.3d 649,307 U.S.App.D.C. 1999.

Lastly, it should be noted that inmates that are subject to deportation/removal typically spend an extra three (3) months incarcerated, because after completing their sentence, they are transferred to another facility to be processed for deportation. That process usually takes approximately three (3) months to complete.

The undersigned counsel is well-aware of the case of *Reascos-Renia v. United States,* 2017 WL 6513752 (11th Cir, 2017), which noted that, "… this Court has held that a defendant's alien status does not justify a downward departure at sentencing. *See United States v. Maung*, 320 F.3d

1305, 1308–10 (11th Cir. 2003) (*citing to United States v. Veloza,* 83 F.3d 380, 382 (11th Cir. 1996)), *overruled on other grounds by United States v. De Varon*, 175 F.3d 930 (11th Cir. 1999) (*en banc*) (holding that the fact a defendant's alien status rendered him ineligible to serve any part of his sentence in a halfway house did not justify a downward departure.).  <u>However</u>, it is respectfully submitted that when the disability of the Defendant's alien status is considered **in conjunction with** the other pertinent factors, it is fair to give some consideration to the Defendant's alien status and the deprivation of benefits he will experience while serving whatever sentence this Court may impose.

Under 18 U.S.C. §3553(b), a district court may depart from the applicable [sentencing] guideline range if 'the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.' " *United States v. Hoffer*, 129 F.3d 1196, 1200 (11th Cir. 1997).

<u>*Memorandum of Law, Re: Title 18 U.S.C. §3553(a)(1)*</u>
<u>*The nature and circumstances of the offense and the history*</u>
<u>*and characteristics of the Defendant.*</u>

The United States Supreme Court in *Pepper v. United States,* 131 S.Ct. 1229 (2011), emphasized the need for individualized sentencing based not only on the crime, but on the particular defendant as well. They said that Federal sentencing demands that every convicted person be treated as an individual and "every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." Citing: *Gall v. United States*, 128 S.Ct. 586, 589 (2007).

As this Honorable Court is well-aware, the Court has full authority to consider any evidence in deciding whether the Guidelines "properly reflect §3553(a) considerations." *Rita v. United States,* 551 U.S. 338, 351 (2007).

The Supreme Court has expressly directed sentencing courts that they may not presume that the guidelines range is reasonable. *Gall v. United States,* 128 S. Ct. 586 (2007). Rather, sentencing courts are directed to make an "individualized assessment" of the sentence warranted by §3553(a) "based on the facts presented." *Gall v. United States,* 128 S. Ct. at 597 (2007). The result is that "[a] sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008). Ultimately, courts are required to impose a sentence that is "sufficient, but not greater than necessary" to reflect the seriousness of the offense, promote general and specific deterrence, rehabilitate the defendant and protect the public. 18 U.S.C. §3553(a).

## CONCLUSION

It is respectfully submitted that there is a well-founded basis upon which this Court may grant this request for a sentence well-below the low-end of the advisory guidelines sentencing range, specifically a sentence of forty-six (46) months as his brother received.

Such a variance below the advisory guideline range would reflect the seriousness of the offense; promote respect for the law, and provide just punishment for the offense.  Further, a variance of this nature would afford a more than adequate deterrence to any future criminal conduct of the Defendant and protect the public as well.  In sum and substance, this would be in accord with the sentencing principals set forth in Title 18 U.S.C. §3553(a).

Victor Rojas is presently forty-nine (49) years of age, and although he made a very poor decision to engage in this criminal conduct, he certainly deserves another chance to demonstrate that he can return to a fully law-abiding life.

A forty-six (46) month sentence in this instance would be sufficient, but not greater than necessary, to comply with the sentencing goals set forth in Title 18 U.S.C.A. §3553(2)(A-D).

**WHEREFORE**, Defendant, **VICTOR ROJAS,** respectfully prays that this Honorable Court enter its order granting the within Motion for a Downward Variance, and thereby impose a sentence of forty-six (46) months imprisonment and three (3) years' supervised release.

Respectfully submitted,

Ana M. Davide, Esq.
Florida Bar No. 875996
2929 SW 3rd Ave., Suite 420
Miami, Florida 33129
Telephone: (305) 854-6100
Fax: (305) 854-6197
E-mail:  ana@anadavidelaw.com
(Counsel for Defendant, *Victor Rojas*.)

*/s/ Ana M. Davide*
Ana M. Davide, Esq.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 1st day of August, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Ana M. Davide, Esq.
Florida Bar No. 875996
2929 SW 3rd Ave., Suite 420
Miami, Florida 33129
Telephone: (305) 854-6100
Fax: (305) 854-6197
E-mail:  ana@anadavidelaw.com
(Counsel for Defendant, *Victor Rojas*.)


**/s/ *Ana M. Davide***
Ana M. Davide, Esq.


## SERVICE LIST

**United States of America v. Victor Rojas**
**Case No. 19-CR-20141-JLK-2**
**United States District Court, Southern District of Florida**

Timothy J. Abraham, A.U.S.A.
United States Attorney's Office
Southern District of Florida
99 NE 4th Street
Miami, FL 33132
Telephone: (305) 961-9438
Fax: (305) 536-7599
Email: Timothy.Abraham2@usdoj.gov

Daren Grove, A.U.S.A.
United States Attorney's Office
Southern District of Florida
99 NE 4th Street
Miami, FL 33132
Tele: (954) 660-5774
Email: daren.grove@usdoj.gov

Ana Brzica
United States Probation Officer
United States Probation Office
Wilkie D. Ferguson, Jr. U.S. Courthouse
400 North Miami Avenue, 9th Floor South
Miami, Florida 33128
Telephone: (305) 523-5361
E-mail: ana_brzica@flsp.uscourts.gov

*__Composite Exhibit "A"__*

US District Court

Southern District Of Florida

04-25-2020

Case Name: Victor Rojas Bascope

Case Number: 18114-104

Judge James Lawrence King

Mister Judge:

During my relationship with the accused, Victor Rojas, father of my 2 daughters (Tatiana and Raiza Rojas), I have experienced an individual whom I have known as a person with values, principles and impeccable conduct, noble, honest and very much loved by those around him. It is worth emphasizing that he worked hard from sunrise to sunset so that his family did not lack anything.

It is very painful to see the impact that this situation has had on my daughters, it is hard for me to have to deal with the inexperience of seeing my daughters lack the presence of their father.

Many times we learn from mistakes and we also deserve a second chance, I trust that you, Your honour, will have mercy on your decision.

Sincerely;

Norma Chavez

Bogota, NJ 07603

US District Court
Southern District Of Florida
04-25-2020
Case Name: Victor Rojas Bascope
Case Number: 18114-104

Judge James Lawrence King

My name is Tatiana Rojas, I write this letter with a heavy heart. I'm writing this letter on behalf of my father, Victor Hugo Rojas. I am a 24-year-old woman, currently a Nutrition student attending Montclair State University. For all my 24 years I can state and confirm my dad has always been there for his family no matter what. The earliest memory I have of my father was when I was a little girl and I misbehaved, because that's what children do, my mom would yell at me and I would cry, but my father would be the shoulder I'd cry on. My dad has his signature dance moves at parties, he barely even drinks alcohol. In my 24 years I have never seen my father, Victor, drunk. He has always been a hard worker, no doubt. My father always made sure there was food on the table. We would wake up every other Sunday with the house smelling of empanadas, those were his specialties. When possible, he would make dinner for us all, grilled salmon or even broiled chicken. He always tended the yard and made sure our dogs were nicely bathed.

Overall, I can say he has been there for us despite how difficult his Monday-Friday's were from working 6am-5pm. I understand we all make mistakes, I'm pretty sure everyone in this town has made mistakes they completely regret making, but we do learn from them. We all have different routes in life and we can concur any obstacle, but sometimes things don't affect one individual, but a whole family as well. My heart sunk when I found out where my father was, I couldn't believe it. This is the man who raised my sister and I. The man would saved people from a burning building at work from taking action. How could this be?

I hope this letter has given you a different insight on my father, Victor Hugo Rojas, and to have some compassion over the final decision. I trust that you, Judge James Lawrence King, will have mercy on your decision.

Sincerely,
Tatiana Rojas

U.S. District Court
Southern District of Florida
04-25-20
Case Name: Victor Hugo Rojas Bascope
Case Number: 18114-104
Judge James Lawrence King

Hello, this is Raiza Rojas, (resident of ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ Bogota NJ 07603)
and I'm writing this letter to certify that everything I write in this letter is the truth referring
to my father, Victor H. Rojas. I have never taken my father to be the type to be involved
in illegal activities. Seeing him in this new light has come very unexpected for me, I still
lay in shock over this. My father was a man who knew right from wrong when he was
involved in my life. He cared and loved his family for most of his life, and even if we
weren't there we would always be on his mind. He'd bring us gift whenever he could. He
is a loyal and good hearted man. He was a man who wouldn't kill a spider, but trapped it
and took it outside. When I heard the news that my father was being held in a jail for
illegal activities my world froze. It was hard for me to believe that my own father had
been reckless enough to have landed in a jail cell. I am currently 17, 16 when it
happened. It was a month after my birthday and I was waiting anxiously to see him. He
needed to teach me things in life that I might just have to learn on my own. He helped
my mom with the house payments and my sister with her schooling. All of his partake in
our household stopped at a halt, and that causes great distress. My mother has always
been a hard worker and my sister as well, but now that's the only thing they dedicate
their time with. There's no more vacations or enjoyment in this house anymore, it has all
turned to work and wealth. Living in this stressed house put me under great pressure for
my future.
I hope this letter has given you a different perspective of my father, and to have some
empathy for who he was as a person. He has made mistakes to a point of great distress
in everyone's life around him. I wish of you to empathize with my father in his situation.

Thank you,
Raiza Rojas

U.S District Court
Southern Distric of Florida
May 7, 2020
Case Name: Victor Rojas Bascope
Case# 18114-104

Honorable: James Lawrence King
Dear Judge,
My name is Tatiana Rojas. I am the sister of Victor Hugo. Rojas.
I have known Victor Hugo all his life.
I write this letter in advance of the coming sentence of my brother Victor Hugo Rojas. This letter is difficult to write because it is my brother who is facing punishment; it would be a great incentive to say something that could result in a softer sentence for him.
He has been proven to be honest and sincere throughout this process and I will be in this letter the same way. I believe that during all this time Victor Rojas B. became aware of the actions that led to his arrest and the motivations for those actions.
Victor Hugo immigrated to the United States with dreams of self-improvements, he learned English and had his exemplary daughters and a family that he'd taken care of all this time. He complied with his taxes for more than 20 years and was very punctual with his monthly rent payments and family needs.

He always helped our Mother and siblings as needed. He was always attentive and friendly. His best traits were exemplary when attending his customers, bosses and neighbors; everyone had great things to say about him.

I feel that he was naive in the ways that lead him to where he is now. Before this case, he had never been arrested, much less jailed. I think he has learned that the worst of all aspects of the loss of freedom is the separation of his family and loved ones. I believe if he had realized the impact he was going to have on the people he most loved, he would never have done what he did. He always valued his morals and values that his peers had taught him. He appreciated the opportunities that this country offers to its immigrants. I think he could have done much more with his life and I also think he sees it now, but it is not too late.
I ask Honorable: James Lawrence King to condemn him for a shorter sentence. In a few years he could be positively reintegrated into society. In a few years he could see his daughter's finishing college and have the opportunity to be united with family and friends again. I would like him to be beside my mother during her last days, and time is sadly running out. I tell you all these things because I want you to know that it is very painful for our family to see his daughters suffering the way they are. They need their fathers support to move forward in life. For these reasons, if you consider that he deserves a sentence that allows his eventual release from prison in a shorter time, he will not lose his relationships that he once had with his family and friends. After his release he will compensate for not being by their side, and to make a better world but within the limits of the law.
Please leave a small light at the end of the tunnel, an excuse for him to redeem himself in the world and be at the service of the law and with the society.

Sincerely,
Tatiana Rojas.

Queens, NY 11356

Santa Cruz de la Sierra

Bolivia

15 de mayo de 2020

Honorable

United States District Judge

**Dear Judge,**

My name is Frederick Hurtado, I am the nephew, my mother Tania Rojas is his sister and I address you with much respect and admiration. I come through this letter to expose my relationship with Victor Rojas.

Since I was little my uncle Victor was a father figure, helping my mother financially by sending monthly allowances to my mother, a single woman with 4 children, a weight of empathy and the fact of giving without asking for anything in return, are the rates that stood out To my uncle, obviously, he went to the USA for a better life. I have always had admiration for him and since I was able to live with 2014 several moments, I was able to realize the quality of person he is, he invited me to know the city that opened the doors, it was a unique experience not only because of the place but also that In each place we passed he would tell me a story of when he was young (22 years old) and moments that he revived and wanted me to learn, I was able to notice and absorb all that learning.

Then in 2017 I managed to live with him in New Jersey where he can observe a man who would give his life for his 2 daughters who worked as a manager in a parking lot only to welcome his daughters the quality of life he never had. Being close to him, he can modify his values and virtues and copy them, he was always a passive, homelike, home, soccer player and above all a great person.

Now life is usually unfair, and mysteriously appears to teach you a lesson, my uncle is a strong person with a big heart and with all the respect in the world YOU KNOW THAT, KNOW EVERYTHING, that's why I beg you to make your decision the most correct one Possible, I know that in such a developed country the justice system is clear and transparent.

I would like to name a number of episodes where he is a person of good for society wherever he is, but first of all I hope he can have the opportunity to read this letter where he can meet a part of my uncle. Victor's family life.

I am confident and confident in making decisions that benefit my uncle in the prayer he may face,

I say goodbye cordially.

FREDERICK HURTADO

Lilian Gomez

Clifton, NJ 07011

July 16th 2020

US District Court
Southern District of Florida
Senior Judge James Lawrence King

RE: Victor Rojas Bascope, Case Number 18114-104

Dear Judge King,

I am writing on behalf of my dear friend, Victor Rojas, a defendant in one of your upcoming court cases. Victor Rojas is a dear friend whom I've known for over twenty years. I was both troubled and shocked to hear about his recent case as he has always been a man of good values, integrity, and kindness. I write this letter of reference with pride for Mr. Victor Rojas regarding this matter. I write this letter with hopes the court will show some leniency.

Victor Rojas has always been a true example of a family man – dedicating majority of his life and time to providing for his two daughters and wife. Since I have known him, he has not allowed his stressful and strenuous employment impact his lifestyle as a man who always wore a smile and offered genuine advice to those who approached him. It is worth pointing out Victor's empathy and understanding of other's situations as he became a role model for my own son who had a childhood without a father.

It is unfortunate that he has made some bad decisions resulting in this situation. I am still surprised by the news but am not surprised that Victor is ready to accept responsibility for his actions. He is a man of good character who has always learned from his previous mistakes.

It is my sincere hope the court takes this letter into consideration at the time of sentencing. Victor Rojas is a valuable individual to society and a good human being.

Sincerely,

*Lilian Gomez*

Lilian Gomez